1  BRODSKY & SMITH, LLC
   EVAN J. SMITH
2  9595 Wilshire Blvd.
   Beverly Hills, CA 90212
3  Telephone: (310) 300-8425
   Facsimile: (310) 247-0160
4
   PROFY PROMISLOFF & CIARLANTO, P.C.
5  JEFFREY. J. CIARLANTO
   JOSEPH M. PROFY
6  DAVID M. PROMISLOFF
   100 N. 22nd Street, Unit 105
7  Philadelphia, PA 19103
   Telephone: (215) 259-5156
8  Facsimile: (215) 600-2642

9  *Counsel for Plaintiff Francis Fleming*

10 [Additional Counsel on Signature Page]

11              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
12

13 _____        :
   FRANCIS FLEMING, derivatively on    :   Civil Action No.
14 behalf of TWITTER, INC.,            :
                                       :
15                        Plaintiff,   :
                                       :
16 v.                                  :
                                       :
17                                     :   VERIFIED SHAREHOLDER DERIVATIVE
   RICHARD COSTOLO, ANTHONY            :   COMPLAINT FOR BREACH OF
18 NOTO, JACK DORSEY, PETER            :   FIDUCIARY DUTIES, UNJUST
   FENTON, DAVID ROSENBLATT,           :   ENRICHMENT AND VIOLATIONS OF
19 MARJORIE SCARDINO, and EVAN         :   SECTION 14(A) OF THE SECURITIES
   WILLIAMS,                           :   EXCHANGE ACT OF 1934
20                                     :
                                       :
21                        Defendants,  :
                                       :
22 and                                 :   DEMAND FOR JURY TRIAL
                                       :
23 TWITTER, INC.,                      :
                                       :
24            Nominal Defendant.       :
                                       :
25 _____        :

26

27

28
                                    - 1 -
   VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST
   ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

1.     Plaintiff Francis Fleming ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duties and Unjust Enrichment (the "Complaint") for the benefit of nominal defendant Twitter, Inc. ("Twitter" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from at least February 2015 through the present (the "Relevant Period").

## NATURE OF THE ACTION

2.     According to its public filings, Twitter is a global platform for public self-expression and conversation in real time, where any user can create a Tweet and any user can follow other users. The Company's main source of revenue is advertising. Because advertising revenue is driven by the total number of users on the platform and, equally as important, the level of engagement of such users, the Company and analysts have focused closely on metrics measuring total users and user engagement. Twitter reported two primary user metrics: Monthly Active Users or "MAUs" (a measure of the total user base) and timeline views (a measure of user engagement).

3.     At an all-day meeting with analysts on November 12, 2014, the defendants reported that the number of MAUs was expected to increase significantly "to over 550 million [MAUs] in the intermediate term and . . . over a billion . . . [MAUs] over the longer term." Defendants announced several new product initiatives designed to drive growth in MAUs and user engagement. Defendants also announced that Twitter would discontinue reporting its primary user engagement metric, timeline views, stating the reason for the change was that the metric was an unrepresentative measure of user engagement and no longer reflective of Twitter's business.

4.     On February 5, 2015, after the market closed, the defendants caused Twitter to release its fourth quarter and fiscal year 2014 financial results. Defendants caused the Company to report non-GAAP net income of $79 million, or non-GAAP earnings per share ("EPS") of $0.12, and revenue of $479 million for the fourth quarter ended December 31, 2014. Additionally, defendants caused the Company to report non-GAAP net income of $101 million, or non-GAAP EPS of $0.14, and revenue of $1.4 billion for the fiscal year ended December 31, 2014. Defendants blamed lower

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

than expected MAU growth on "quarter-specific factors . . . which include seasonality and a couple of issues related to the launch of iOS 8."  Furthermore, the defendants reiterated the Company's outlook for strong MAU growth going forward and emphasized the success of the new product initiatives designed to "drive [MAU] growth."  Defendants also reiterated that Twitter would discontinue reporting its primary user engagement metric, timeline views.

5.      Following the defendants' statements on February 5, 2015, Twitter's stock price increased nearly 17% in one day to close at $48.01 per share on February 6, 2015.

6.      On April 28, 2015, the defendants caused Twitter to release its first quarter 2015 financial results.  The defendants caused the Company to report non-GAAP income of $47 million, or $0.07 non-GAAP EPS, and revenue of $436 million for the first quarter ended March 31, 2015. Additionally, the defendants caused the Company to provide its outlook for the second quarter of 2015, projecting second quarter revenue of $470 million to $485 million.  Defendants also lowered Twitter's full year 2015 revenue forecast to between $2.17 billion and $2.27 billion from prior guidance of $2.30 billion to $2.35 billion.  Furthermore, defendants caused the Company to report that Twitter's MAUs only increased 5% over the prior quarter.

7.      As a result of this news, the price of Twitter stock dropped $9.39 per share to close at $42.27 per share on April 28, 2015, a decline of 18%.  On the following day, April 29, 2015, the price of Twitter stock dropped gain, falling $3.78 per share to close at $38.49 per share, a one-day decline of nearly 9%.

8.      However, the stock continued to trade at artificially inflated levels as the defendants provided assurances that new initiatives to drive user growth and engagement were still in the early stages.

9.      Then, on July 28, 2015, after the market closed, the defendants caused Twitter to issue a press release announcing its second quarter 2015 financial results.  Defendants caused the Company to report non-GAAP income of $49 million, or $0.07 non-GAAP EPS, and revenue of $502 million for the second quarter ended June 30, 2015.  Additionally, the defendants caused the Company to provide its outlook for the third quarter of 2015, projecting third quarter revenue of $545 million to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST
ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

$560 million.  Defendants also provided Twitter's outlook for the 2015 full year, projecting revenue in the range of $2.20 billion to $2.27 billion.

10.    As a result of this news, the price of Twitter stock plummeted $5.30 per share to close at $31.24 per share on July 29, 2015, a one-day decline of nearly 15%.  The stock has not recovered for any significant period of time, and presently trades at less than $20 per share.

11.    Thus, as a result of defendants' breaches and other misconduct, the Company has suffered damages.

## JURISDICTION AND VENUE

12.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.    Venue is proper in this district because Twitter conducts business and maintains its principal executive offices this district.  Upon information and belief, one or more of the defendants resides in this district.  Further, Twitter engages in numerous activities and conducts business here, which had an effect in this district.

## THE PARTIES

14.    Plaintiff is a current shareholder of Twitter and has continuously held Twitter stock since January 2014.

15.    Nominal defendant Twitter is a Delaware corporation with its principal executive offices located at 1355 Market Street, Suite 900, San Francisco, CA 94103.

16.    Defendant Richard Costolo ("Costolo") was, until his resignation on July 1, 2015, Chief Executive Officer ("CEO") and a director of Twitter.  During the Relevant Period, while in possession of material, adverse, non-public information, defendant Costolo sold at least 77,009 personally held shares of Twitter stock at artificially inflated prices for proceeds of more than $3 million.

17.    Defendant Anthony Noto ("Noto") has served as Chief Financial Officer ("CFO") of

- 4 -

Twitter since July 2014.

18.    Defendant Jack Dorsey ("Dorsey") has served as Twitter's CEO since September 2015 and has served as a director of the Company since May 2007.  Defendant Dorsey served as the Company's interim CEO from July 2015 to September 2015, and served as President and CEO from May 2007 to October 2008. Dorsey also served as Chairman of the Board from October 2008 to September 2015.  During the Relevant Period, while in possession of material, adverse, non-public information, defendant Dorsey sold at least 75,630 personally held shares of Twitter stock at artificially inflated prices for proceeds of approximately $3.6 million.

19.    Defendant Peter Fenton ("Fenton") has served as a director of the Company since February 2009. During the Relevant Period, Fenton was a member of the Board's Audit Committee (the "Audit Committee") and the Chair of the Board's Compensation Committee (the "Compensation Committee").

20.    Defendant David Rosenblatt ("Rosenblatt") has served as a director of the Company since December 2010. During the Relevant Period, Rosenblatt was a member of the Board's Nominating and Governance Committee (the "Nominating and Governance Committee") and the Compensation Committee.

21.    Defendant Marjorie Scardino ("Scardino") has served as a director of the Company since December 2013. During the Relevant Period, Scardino was a member of the Audit Committee and the Compensation Committee.

22.    Defendant Evan Williams ("Williams") has served as a director of the Company since May 2007.  During the Relevant Period, while in possession of material, adverse, non-public information, Williams sold millions of personally held shares of Twitter stock at artificially inflated prices for proceeds of approximately $274.5 million.

23.    Collectively, defendants Costolo, Noto, Dorsey, Fenton, Rosenblatt, Scardino, and Williams shall be referred to herein as "Defendants."

24.    Collectively, defendants Fenton and Scardino shall be referred to as the "Audit Committee Defendants."

25.   Collectively, defendants Costolo, Dorsey and Williams shall be referred to as the "Insider Selling Defendants."

**DEFENDANTS' DUTIES**

26.   By reason of their positions as officers, directors, and/or fiduciaries of Twitter and because of their ability to control the business and corporate affairs of Twitter and its subsidiaries, Defendants owed Twitter and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Twitter in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Twitter and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Twitter and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

27.   Defendants, because of their positions of control and authority as directors and/or officers of Twitter, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Twitter, each of the Defendants had knowledge of material non-public information regarding the Company.

28.   To discharge their duties, the officers and directors of Twitter were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Twitter were required to, among other things:

a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules,

- 6 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

regulations and requirements, and all contractual obligations, including acting only

within the scope of its legal authority; and

c. When put on notice of problems with the Company's business practices and

operations, exercise good faith in taking appropriate action to correct the

misconduct and prevent its recurrence.

29.     Additionally, the Company's Code of Business Conduct and Ethics (the "Code of

Ethics"), which expressly applies to all Defendants named herein, states the following:

Financial integrity and fiscal responsibility is everyone's personal responsibility. The money we spend for Twitter is not ours; it belongs to the company's and, ultimately, our shareholders'. Each person at Twitter – not just those in Finance – has a role in making sure that money is appropriately spent, our financial records are complete and accurate and our internal controls are honored. This matters every time we hire a new vendor, expense something to Twitter, sign a new business contract or enter into any deals on Twitter's behalf.

Twitter maintains a system of internal controls to reinforce our compliance with legal, accounting, tax and other regulatory requirements in every location in which we operate. Stay in compliance with our system of internal controls, and don't hesitate to contact Legal or Finance if you have any questions.

30.     Pursuant to the terms of the Audit Committee's Charter, the Audit Committee

Defendants were responsible for, *inter alia,* the following:

5. Review Financial Statements. The Audit Committee shall review and discuss the following with management, the internal auditors, if applicable, and the independent auditor, as applicable:
• The scope and timing of the annual audit of the Company's financial statements.
• The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.
• The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the audited financial statements.
• The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.
• Major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles.
• Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

• The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.
• Any significant changes required or taken in the audit plan as a result of any material control deficiency.
• Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.
• Any significant disagreements between management and the independent auditor.

\*       \*       \*

7. Audit Committee Report. The Audit Committee will prepare the report of the Audit Committee that SEC rules require to be included in the Company's annual proxy statement.

8. Earnings Press Releases and Earnings Guidance. The Audit Committee will review, in general, earnings press releases, and review and discuss with management and the independent auditors policies with respect to earnings press releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts and ratings agencies.

9. Internal Controls. The Audit Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted in light of any material control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

10. Disclosure Controls and Procedures. The Audit Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.

11. Internal Audit. The Audit Committee shall:
• Review with the independent auditor a discussion of management's plans with respect to the responsibilities, budget and staffing of the internal audit function and the Company's plans for the implementation of the internal audit function.

12. Legal and Regulatory Compliance. The Audit Committee shall:
• Review and discuss with management, the internal auditors, if applicable, and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct & Ethics, compliance with anti-bribery and anti-corruption laws and regulations, and compliance with export control regulations and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs.
• Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.
• Discuss with the Company's senior legal officer any legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

13. Complaints. The Audit Committee shall establish and oversee procedures for the

- 8 -

receipt, retention and treatment of complaints on accounting, internal accounting controls or audit matters, as well as for confidential and anonymous submissions by the Company's employees concerning questionable accounting or auditing matters.

14. Risk Assessment and Risk Management. The Audit Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management.

15. Related Party Transactions. The Audit Committee shall review and oversee all transactions between the Company and a related person (as defined in Item 404 of Regulation S-K), in accordance with the Company's policies and procedures.

SUBSTANTIVE ALLEGATIONS

**A.    Background of the Company**

31.    According to its public filings, Twitter operates as a global platform for public self-expression and conversation in real time. It offers various products and services that allow users to create, distribute and discover content.  The Company also provides promoted products and services – such as promoted tweets, promoted accounts and promoted trends – that enable its advertisers to promote their brands, products and services, and subscription access to its data feed for data partners.

32.    Following its November 2013 initial public offering (the "IPO"), Twitter's stock price increased significantly to as high as $70 per share in late 2013.  A key to the Company's successful IPO was substantial growth in its two primary user metrics: MAUs (a measure of the total user base) and timeline views (a measure of user engagement).  For example, the Company had doubled its MAUs in the 24 months preceding the IPO to 232 million and the trajectory was expected to continue. As noted by one analyst, "'[t]he company has kind of pitched itself as a billion-user business long term.'"  User metrics, including user engagement, were highlighted over fifty times in Twitter's S-1 Registration Statement filed in connection with its IPO, including:

- "Growth in our user base and user engagement is a fundamental driver to the growth of our business."

- "User growth trends reflected in the number of MAUs, user engagement trends reflected in timeline views and timeline views per MAU . . . are key factors that affect our revenue."

- 9 -

- "The size of our user base and our users' level of engagement are critical to our success."

33.    User engagement metrics were of particular importance because more engaged users would lead to higher MAU growth and higher advertising revenues.  Twitter's primary user engagement metrics were timeline views and timeline views per MAU.[1]  As Defendants indicated, "[t]imeline views are kind of proxy for the amount of content our users consume."  Defendants closely tracked user engagement metrics, including timeline views.[2]  User engagement became even more important to analysts and investors starting in the second half of 2014 when Twitter's MAU growth began to decelerate. As Defendants have caused the Company to acknowledge, "as your MAU growth slows, engagement becomes a much bigger factor."  (*See also, e.g.*, "To the extent our user growth rate slows, our success will become increasingly dependent on our ability to increase levels of user engagement . . . .").[3]

34.    On November 12, 2014, Defendants caused Twitter to hold an all-day meeting with analysts ("Analyst Day").  Twitter executives emphasized new initiatives to drive user engagement and reinvigorate MAU growth. In addition, Defendants caused Twitter to abruptly announce that it would cease reporting its sole user engagement metric, timeline views, going forward.  Defendants

---

[1] Twitter S-1 Registration Statement (issued under Defendants' direction and on their watch) set forth, in relevant part:

- "We broadly measure user engagement on our platform through timeline views and the number of timeline views per MAU."

- "We believe that timeline views and timeline views per MAU are measures of user engagement."

[2] Twitter Form 10-K for the year ended December 31, 2014:

NOTE REGARDING KEY METRICS

We review a number of metrics, including monthly active users, or MAUs, timeline views, timeline views per MAU and advertising revenue per timeline view, to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions.

[3] Twitter S-1 Registration Statement.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

contended that the recent trend of declining timeline views was not indicative of an actual declining trend in user engagement.

35.     Defendants did not provide any alternative user engagement metrics despite acknowledgment that such alternative metrics were tracked internally by management. For example:

> [Analyst:] So, Bob Pecks, SunTrust. . . . And then as analysts at Wall Street, how should [we] gauge your progress, what metrics should we be looking at and once we see those metrics pop up so we can see that you're actually getting traction with the products? Thanks.

> *          *          *

> [Trevor O'Brien, Twitter Director of Product Management:] And then the last part of your question Bob, on how do you measure us in metrics, I mean ultimately, we want to drive shareholder value that's going to be tied to our financials. We're not naive to think that you're not going to focus on the leading indicators of financials, long-term growth potential. And so there are going to be non-financial metrics to look at. . . .

> . . . We constantly evaluate a number of different metrics and [debate] what we should be disclosing, what we're not disclosing.

> *          *          *

> [Noto:] I'll tell you, we struggle with the measure [of] engagement not because we're not smart, but because there's a lot of measurements of engagement . . . .

36.     The Analyst Day comments also included a discussion of new product initiatives that Defendants represented would grow the user base and improve user engagement.[4]  Defendant Noto described the impact of the new initiatives on user growth as follows:

> We think we have a significant product roadmap, much of which hasn't been launched yet that [we] believe positions us to grow our monthly active users by 2x to over 550 million in the intermediate term and 3-4x to over a billion core users, monthly active users over the longer term.

**B.     Defendants' False and Misleading Statements Issued During the Relevant <u>Period</u>**

37.     On February 5, 2015, after the market closed, Defendants issued a press release announcing Twitter's fourth quarter and fiscal year 2014 financial results.  Defendants caused the

---

[4] For example: "Today, you will hear about a number of initiatives we have underway to grow our core of monthly active users . . . ."; "[W]e've launched things in the past year, or recently that have demonstrated key results, where we have tested the work, they're also showing positive results."; "[W]e've been testing this for a while and [have] seen very positive results."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

Company to report non-GAAP net income of $79 million, or non-GAAP EPS of $0.12, and revenue of $479 million for the fourth quarter ended December 31, 2014.  Additionally, Defendants caused the Company to report non-GAAP net income of $101 million, or non-GAAP EPS of $0.14, and revenue of $1.4 billion for the fiscal year ended December 31, 2014.  Twitter's revenue was higher than projected, but MAU growth was less than expected and the timeline views metric (the last time Twitter would report it) was flat.  In the conference call later that day, Defendants blamed the low MAU growth on "quarter-specific factors that impacted our net adds in Q4, which include seasonality and a couple of issues related to the launch of iOS 8."  Furthermore, the release provided the Company's outlook for strong MAU growth in the first quarter of 2015, stating in part:

> "We closed out the year with our business advancing at a great pace. Revenue growth accelerated again for the full year, and we had record quarterly profits on an adjusted EBITDA basis," said Dick Costolo, CEO of Twitter. "In addition, the trend thus far in Q1 leads us to believe that the absolute number of net users added in Q1 will be similar to what we saw during the first three quarters of 2014."

38.     After releasing Twitter's fourth quarter and fiscal year 2014 financial results, on February 5, 2015, Defendants held a conference call for analysts, media representatives and investors during which defendant Noto represented the following:

> In terms of engagement metrics, as I mentioned, we're no longer going to provide the metric of timeline view. And the reason for that is it's really a measurement that doesn't reflect the initiatives that we're doing. In fact, if anything, we're taking specific initiatives and product changes that will hurt timeline view. . . . And so that's why we decided to eliminate the timeline view metric, given that we have specific product changes that will hurt that metric. More broadly, as we think about engagement, there are a number of different ways that we measure engagement – there's no one perfect way. When it comes to advertising, it's going to be click-through rate. And it's actually different by each format. A mobile app download click-through rate is very different than a regular Promoted Tweet that could be either re-tweeted or favorited as a measurement of payment.
>
> *     *     *
>
> And so as we get to a point where we have a metric that's going to really reflect what we're trying to do, we'll share that with you. But, at this point, there's a number of them that we look at, and no one metric to share.

39.     Defendants also emphasized the success of the new product initiatives that the Company had previously introduced at its Analyst Day. For example:

> [Analyst:] On the MAU number . . . I'm curious as to the acceleration [in MAU

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

growth] there, if that's seasonality or something else?

                                    *       *       *

[Costolo:] Sure. Thanks, Paul, this is Dick. In Q1, I would say it's a combination of seasonality, a return to organic growth, and the set of product initiatives we've created to drive growth. Again, at a high level, I'd like to say that I'm thinking about growth and our product as, these changes we're making now as helping us grow across logged-in, logged-out, and our syndicated audience across the web and third-party mobile apps.

The user numbers we saw on January, again, indicate that our MAU trend has already turned around, and that Q1 trend is likely to be back in the range of absolute net ads that we saw during the first three quarters of 2014. So we're in a great place there. And, again, I would stress that it's seasonality, a return to organic growth, and product initiatives, all taken together.

    40.    Following these statements (made or caused to be made by Defendants) on February 5, 2015, Twitter's stock price increased nearly 17% in one day to close at $48.01 per share on February 6, 2015.  Analysts viewed these results favorably.  For example, J.P. Morgan raised its price target to $67.00 per share, stating:

> Twitter reported strong 4Q results as both revenue and EBITDA came in well above our and Street estimates despite MAU net adds of 4M Q/Q that came in 3M light vs. the Street and below our 6M due to a 4M negative impact related to the iOS 8 update. More importantly, the company believes it is on track to return to 13-16M Q/Q MAU net adds in 1Q15 and we think the strong cadence of product launches/enhancements should drive improving MAU growth through 2015. Ad revenue of $432M increased 97% Y/Y, well above our $411.1M driven by revenue/1,000 TLVs which increased 49% Y/Y as TWTR continues to show strength in monetization. We note that Twitter's ad load remains well below industry peers such as Facebook. EBITDA of $142M was well above our $110M, with margins increasing more than 11% points Y/Y to nearly 29.5% in 4Q. We believe the 1Q and 2015 guide could be conservative, despite tougher Y/Y comps due to the Olympics, FIFA World Cup and FX headwinds, as we expect ad demand to continue increasing.
> We believe the pace and quality of execution at the company continues to improve and that onboarding improvements, rich content (i.e. video), & better timeline organization can drive user growth going forward.

    41.    Defendants' February 5, 2015 statements were materially false and misleading. Defendants concealed adverse facts they knew or deliberately disregarded, including the following: (a) by early 2015, daily active users ("DAUs") had replaced the timeline views metric as the primary user engagement metric tracked internally by Twitter management (including by Defendants); (b) by early 2015, the trend in user engagement growth (*i.e.*, DAUs) was flat or declining; (c) new product initiatives were not having a meaningful impact on MAUs or user engagement; (d) the "acceleration

- 13 -

[in MAU growth]" under Defendants' direction and on their watch was the result of low-quality MAU growth (in which new users were not as engaged as existing users); and (e) Defendants lacked a basis for their previously issued projections of approximately 20% MAU growth and 550 million MAUs in the immediate term.

42.     On February 6, 2015, almost immediately following these comments and the resulting increase in Twitter's stock price, and while in possession of material, adverse, non-public information, defendant Dorsey sold at least 75,090 personally held shares of his Twitter stock at artificially inflated prices of between $46.52 and $48.17 per share, for proceeds of approximately $3,604,651.67.  Defendant Dorsey's sales were timed to maximize profits from the Company's then artificially inflated stock price.

43.     Between February 18, 2015 and February 26, 2015, while in possession of material, adverse, non-public information, defendant Williams sold 1,319,900 shares of his Twitter stock at prices ranging from $47.88 per share to $49.88 per share, for proceeds of approximately $63,882,358.[5]

44.     On March 2, 2015, Defendants caused Twitter to file its Form 10-K for the year ended December 31, 2014 (the "2014 10-K), signed by Defendants, which incorporated the financial statements previously reported.  The 2014 10-K also discussed timeline views:

> We present and discuss timeline views in this Annual Report on Form 10-K. . . . Additionally, the ongoing optimization of our products has reduced the number of times a user needs to request a timeline view. As a result, our management team believes timeline views have become an unrepresentative measure of, and will not use them internally to measure for, user engagement on our platform.
>
> As we announced on November 12, 2014, we do not intend to disclose timeline views for any future period. They are presented here only for historical purposes.
>
> *          *          *
>
> Timeline Views, Timeline Views Per MAU and Advertising Revenue Per Timeline View. We define timeline views as the total number of timelines requested and delivered when registered users visit Twitter, refresh a home timeline (but not other

---

[5] Defendant Williams' insider sales referenced throughout include shares of his Twitter stock that he personally held, as well as Twitter shares held by entities with which he was affiliated and/or controlled.

timelines) or view search results while such user is logged in or is otherwise authenticated on our website, mobile website or desktop or mobile applications (excluding our TweetDeck and Mac clients, as we do not fully track this data). We believe that timeline views going forward will not be a helpful metric for measuring user engagement because the ongoing optimization of our products has reduced the number of times a user needs to request a timeline view, which has resulted in timeline views becoming an unrepresentative measure of user engagement with our platform. We do not intend to report timeline views metric in future filings but we present it here for historical purposes. Timeline views per MAU are calculated by dividing the total timeline views for the period by the average MAUs for the last three months of such period. In the three months and year ended December 31, 2014, we had 182.0 billion and 692.5 billion timeline views, respectively, which represent increases of 23% and 17% from the three months and year ended December 31, 2013, respectively. In the three months and year ended December 31, 2014, we had 49.2 billion and 191.1 billion timeline views in the United States, respectively, which represent increases of 20% and 16% from the three months and year ended December 31, 2013, respectively. In the three months and year ended December 31, 2014, we had 132.8 billion and 501.3 billion timeline views in the rest of the world, respectively, which each represent an increase of 24% and 17% from the three months and year ended December 31, 2013, respectively. In the three months ended December 31, 2014, we had 631 timeline views per MAU, which represents an increase of 3% from the three months ended December 31, 2013. In the three months ended December 31, 2014, we had 778 timeline views per MAU in the United States and 590 timeline views per MAU in the rest of the world, which represent increases of 3% from the three months ended December 31, 2013.

45.    In addition, the 2014 10-K set forth, in relevant part:

Monthly Active Users (MAUs) . We define MAUs as Twitter users who logged in or were otherwise authenticated and accessed Twitter through our website, mobile website, desktop or mobile applications, SMS or registered third-party applications or websites in the 30-day period ending on the date of measurement. Average MAUs for a period represent the average of the MAUs at the end of each month during the period. MAUs are a measure of the size of our active user base. In the three months ended December 31, 2014, we had 288 million average MAUs, which represents an increase of 20% from the three months ended December 31, 2013. The growth in average MAUs was driven primarily by organic growth and growth initiatives. In the three months ended December 31, 2014, we had 63 million average MAUs in the United States and 225 million average MAUs in the rest of the world, which represent increases of 17% and 21%, respectively, from the three months ended December 31, 2013.

46.    The 2014 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), signed by defendants Costolo and Noto, who stated:

I, [Richard Costolo/Anthony Noto], certify that:

1. I have reviewed this Annual Report on Form 10-K of Twitter, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\*     \*     \*

I, [Richard Costolo/Anthony Noto], certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report on Form 10-K of Twitter, Inc. for the fiscal year ended December 31, 2014 fully complies with the requirements of Section 13(a) or 15(d) of the Securities

- 16 -

Exchange Act of 1934 and that information contained in such Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Twitter, Inc.

47.     Defendants' March 2, 2015 statements were materially false and misleading. Defendants concealed adverse facts they knew or deliberately disregarded, including the following: (a) Under Defendants' direction and on their watch, DAUs had become the primary user engagement metric tracked internally by Twitter management.  The trend in user engagement growth (*i.e.*, DAU growth) was flat or declining. As noted by the United States Securities and Exchange Commission (the "SEC"), MD&A disclosure rules required the disclosure of key internal metrics used by management;[6] and (b) The ad engagement metric, which Defendants intended to be "helpful to investors to understand" and "monitor trends in user engagement," was a monetization metric rather than a user engagement metric.  The trend in "ad engagements" was not indicative of trends in user engagement.  In fact, the trend in "ad engagements" was moving in the opposite direction (*i.e.*, increasing) from the trend in user engagement.

48.     Between March 5, 2015 and March 17, 2015, while in possession of material, adverse, non-public information, defendant Williams sold 965,016 shares of his Twitter stock at prices between $41.62 per share and $48.33 per share, for proceeds of approximately $45,308,631.  Then, between April 1, 2015 and April 24, 2015, defendant Williams sold 1,404,000 shares of his Twitter stock at prices between $50.22 per share and $51.78 per share, for proceeds of approximately $71,749,522.

49.     On April 1, 2015, while in possession of material, adverse, non-public information, defendant Costolo sold 18,845 shares of his Twitter stock at $50.92 per share, for proceeds of approximately $959,499.

50.     The disclosures in the 2014 10-K about the elimination of the timeline view metric

---

[6] In particular, SEC Release 33-8350 states that "one of the principal objectives of MD&A is to give readers a view of the company through the eyes of management . . . . [C]ompanies should 'identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.'" Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Release Nos. 33-8350, 34-48960, 2003 SEC LEXIS 3034, at *25 (Dec. 19, 2003).

would later lead to an April 13, 2015 inquiry from the SEC requesting alternative metrics to explain trends in user engagement. The SEC letter stated, in relevant part:

> We note your disclosures relating to Timeline Views, Timeline Views per Monthly Active User (MAU), and Advertising Revenue Per Timeline. We also note on page 46 that going forward you intend to cease presenting timeline views in future filings.
>
> Please address the following:
>
> •        Please describe the alternative metric(s) you anticipate presenting in future filings to explain trends in user engagement and advertising services revenue. Also, please describe your reasons for choosing such metric(s).
>
> *          *          *
>
> We refer you to Section III.B of SEC Release 33-8350.

51.    Twitter's response to the SEC (issued under Defendants' direction and on their watch on May 11, 2015) included alternative user engagement metrics that were purportedly used internally by Defendants:

> The Company respectfully advises the Staff that it has included two metrics, changes in ad engagements and changes in cost per ad engagement, on page 25 in the Key Metrics section of its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015, filed on May 11, 2015 (the "Form 10-Q"). These metrics are intended to serve as a measure of user engagement and demand, respectively, on the Company's platform. Ad engagements measure user interactions with the Company's Promoted Products and include expanding, retweeting, favoriting or replying to a Promoted Tweet, playing an embedded video, downloading a promoted mobile application or opting in to further communications from an advertiser in a Promoted Tweet, following the account that tweets a Promoted Tweet or following a Promoted Account. Therefore, changes in ad engagements indicate trends in user engagement and, in particular, user engagement with ads, which affects revenue. Changes in cost per ad engagements reflect the changes in the average cost per ad engagement in the period discussed.
>
> The Company's management internally tracks changes in ad engagements and cost per ad engagement on the Twitter platform to monitor trends in user engagement and advertising services revenue and believes these metrics are helpful to investors to understand the same. The Company uses changes in ad engagements and cost per ad engagements to assess drivers for monetization on its platform in its Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"). In addition, the Company believes the metrics may be a helpful comparison of the Company's performance against other companies in its market, which also report changes in engagements with advertisements on their platforms.
>
> The Company notes that while it provides a qualitative discussion of the changes to its advertiser base for additional context about growth in revenue, the Company does not manage its business based on the number of advertisers or revenue per advertiser. Therefore, the Company does not believe disclosing the number of advertisers or

- 18 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

revenue per advertiser would be material to investors' understanding of the Company's advertising services revenue. While having more advertisers bidding on the Company's Promoted Products can result in increased revenue, disclosing the number of advertisers on the platform is not necessarily indicative of the health of the Company's advertising services revenue. For example, the Company could gain one large brand advertiser in a period that spends significantly more than all of the new small business advertisers in that same period. In addition, specifically quantifying advertisers for purposes of regular quarterly disclosures would require the Company to undertake new procedures and define counting conventions, which it does not currently do, relating to multiple advertisers working through the same advertising agency and multiple advertising brands that are part of one legal entity or group; providing specific and reliable information regarding the number of advertisers in a timely way at the Company's scale is not practical.

52.     The statements in the May 11, 2015 letter that Defendants caused to be sent to the SEC were false and misleading when made because the ad engagement metric, which Defendants represented would be "helpful to investors to understand" and "monitor trends in user engagement," was a monetization metric rather than a user engagement metric. The trend in "ad engagements" was not indicative of trends in user engagement. In fact, the trend in "ad engagements" was moving in the opposite direction (*i.e.*, increasing) from the trend in user engagement.

53.     On April 20, 2015, Defendants caused the Company to file with the SEC (and disseminate to shareholders) a Proxy Statement on Form DEF 14A (the "2015 Proxy"). The 2015 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for election. However, in the 2015 Proxy, Defendants misrepresented and/or failed to disclose that: (i) under Defendants' direction and on their watch, new product initiatives were not creating meaningful growth in MAUs or user engagement; (ii) the reported growth in MAUs was the result of increased numbers of low-quality MAUs who were less engaged than existing Twitter users; (iii) by early 2015, Defendants were causing the Company to track DAUs rather than timeline views as the primary user engagement metric; (iv) by early 2015, the Company's metrics showed that user engagement growth was flat or declining; and (v) as a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

54.     On April 28, 2015, Defendants issued a press release announcing Twitter's first quarter

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

2015 financial results.[7]  Defendants caused the Company to report non-GAAP income of $47 million, or $0.07 non-GAAP EPS, and revenue of $436 million for the first quarter ended March 31, 2015. Additionally, Defendants provided Twitter's outlook for the second quarter of 2015, projecting second quarter revenue of $470 million to $485 million.  Defendants also lowered the Company's full year 2015 revenue forecast to between $2.17 billion and $2.27 billion, from prior guidance of $2.30 billion to $2.35 billion.  Furthermore, Defendants reported that Twitter's MAUs only increased 5% over the prior quarter, including 3% growth in U.S. MAUs.

55.     After releasing Twitter's first quarter 2015 financial results on April 28, 2015, Defendants held a conference call for analysts, media representatives and investors during which defendant Noto stated:

> [W]e expect the factors which led to our marginally slower growth in Q1 to continue for the full year of 2015.
>
> *  *  *
>
> In Q2 . . . there's also some headwinds. . . . We're off to a slow start in April and . . . the trend is not similar to Q1 . . . .

56.     Defendant Noto also commented on user engagement metrics:

> In terms of engagement metrics, there's a lot of different metrics that we look at internally. There's not one metric for engagement. And so I can give you a sense of some of them and quite frankly, we would like to be able to give you more visibility on this, but there's just a number of different measurements.
>
> *       *       *
>
> [W]e continue to look for metrics that could be helpful to you and we will try to give you color from time to time across these different metrics . . . .

57.     As a result of this news, the price of Twitter stock dropped $9.39 per share to close at $42.27 per share on April 28, 2015, a decline of 18%.  On the following day, April 29, 2015, the price of Twitter stock dropped again, falling $3.78 per share to close at $38.49 per share, a one-day decline of nearly 9%.

58.     However, Defendants' positive statements about active users and Twitter's new

---

[7] This earnings release was mistakenly released at 3pm EST before the market closed. Defendants caused Twitter to confirm the unintentional release, which led to the NYSE halting trading in the Company's stock. Trading resumed before the market closed. The Company held its earnings call with analysts as originally scheduled after the market closed.

1   initiatives kept the stock from dropping further.  For example, Defendants represented the following

2   on the conference call:

3       [Costolo:] I talked last quarter about the experiments we were running to test instant

4       timelines.

5                               *          *          *

6       The results during our experiment were quite positive in terms of engagement . . . .

7                               *          *          *

8       [Noto:] We are very encouraged by the growth we've experienced thus far, but as often
        is the case with new products, we have a great deal of iterating and fine-tuning to do

9       as we scale in order to maximize the effectiveness of these products in our complex
        marketplaces.

10      59.    Defendants' April 28, 2015 statements were materially false and misleading.

11  Defendants concealed adverse facts they knew or deliberately disregarded, including the following:

12  (a) Under Defendants' direction and on their watch, DAUs had become the primary user engagement

13  metric tracked internally by Twitter management.  The trend in user engagement growth (*i.e.*, DAU

14  growth) was flat or declining; and (b) New product initiatives implemented under Defendants'

15  direction and on their watch were not effective at increasing user engagement or MAU growth.

16      60.    On May 11, 2015, Defendants caused Twitter to file its Form 10-Q for the first quarter

17  of 2015, which incorporated the financial statements previously reported. In the 10-Q, Defendants

18  stated the following regarding user metrics:

19      NOTE REGARDING KEY METRICS
        We review a number of metrics, including monthly active users, or MAUs, changes in

20      ad engagements and changes in cost per ad engagement, to evaluate our business,
        measure our performance, identify trends affecting our business, formulate business

21      plans and make strategic decisions.

22      61.    Defendants' May 11, 2015 statements were materially false and misleading.

23  Defendants concealed adverse facts they knew or deliberately disregarded, including that DAUs had

24  become the primary user engagement metric tracked internally by Twitter management, and the trend

25  in user engagement growth (*i.e.*, DAU growth) was flat or declining.  SEC MD&A disclosure rules

26

27

28
                                            - 21 -

required the disclosure of key internal metrics used by management.[8]

62.     Between May 20, 2015 and May 29, 2015, while in possession of material, adverse, non-public information, defendant Williams sold 1,103,128 shares of his Twitter stock at prices between $36.37 per share and $37.82 per share, for proceeds of approximately $40,536,343.  Then, between June 9, 2015 and June 23, 2015, while in possession of material, adverse, non-public information, defendant Williams sold 744,000 shares of his Twitter stock at prices between $35.57 per share and $36.14 per share, for proceeds of approximately $26,612,815.

C.     **The Truth Begins to Emerge**

63.     On June 11, 2015, Defendants caused Twitter to announce the "resignation" of defendant Costolo. Media attributed his departure to the Company's struggles with growth in MAUs and user engagement.  Nonetheless, on July 1, 2015, while in possession of material, adverse, non-public information, defendant Costolo sold 58,164 shares of his Twitter stock at $35.56 per share, for proceeds of approximately $2,068,155.

64.     Then, between July 8, 2015 and July 22, 2015, defendant Williams sold 744,000 shares of his Twitter stock at prices between $34.66 per share and $36.74 per share, for proceeds of approximately $26,444,962.

65.     On July 28, 2015, Twitter's stock closed at $36.54 per share.  After the market closed that day, Defendants issued a press release announcing Twitter's second quarter 2015 financial results.  Defendants caused the Company to report non-GAAP income of $49 million, or $0.07 non-GAAP EPS, and revenue of $502 million for the second quarter ended June 30, 2015.  Additionally, Defendants provided Twitter's outlook for the third quarter of 2015, projecting third quarter revenue of $545 million to $560 million.  Defendants also provided the Company's outlook for the 2015 full year, projecting revenue in the range of $2.20 billion to $2.27 billion.  Furthermore, Defendants reported that Twitter's MAUs had increased by only 2 million users over the prior quarter, representing growth of less than 1%.  After releasing the Company's second quarter 2015 financial

---

[8] *See, e.g.*, SEC Release 33-8350.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

results, on July 28, 2015, Defendants held a conference call during which they represented the following:

> [Jack Dorsey, Twitter's Interim CEO:] Product initiatives we've mentioned in previous earnings calls, like instant timelines and logged-out experiences, have not yet had meaningful impact on growing our audience or participation. This is unacceptable, and we're not happy about it.

> *     *     *

> [Noto:] To be clear, however, we do not expect to see sustained meaningful growth in MAUs until we start to reach the mass market. We expect that will take a considerable period of time. . . .

> . . . I wanted to provide an update and some key data points as it relates to the long-term opportunities we discussed at our Analysts Day. First, the ratio of DAU to MAU for our top 20 markets in Q2 2015 was approximately 44% versus the 48% we shared with you at our Analysts Day, which is for the first three quarters of 2014.

> *     *     *

> [I]n the near term, our organic growth is going to be very low, as it was this quarter and as I think about Q3, it's marginally better. But I wouldn't want you to – or anyone else to expect a change in our growth rate relative to what you are seeing in this quarter. I think you'll see that for a while and that was my point.

66.    As a result of this news, the price of Twitter stock plummeted $5.30 per share to close at $31.24 per share on July 29, 2015, a one-day decline of nearly 15%. The Company's share price has not recovered for any significant period of time, and currently trades for less than $20 per share.

67.    In September 2016, multiple media sources reported on the possible sale of Twitter, with potential interest from major companies including Apple, Google/Alphabet and Disney. On that news, Twitter's stock price temporarily increased, reaching $24.87 per share on October 5, 2016.

68.    However, on October 5, 2016, *Recode* (a tech journalism site) reported that Apple, Disney and Google/Alphabet had declined to move forward with an acquisition of Twitter. Moreover, as explained by an investment analyst from Oppenheimer Holdings Inc., in an article posted on the *Silicon Valley Business Journal* website on October 6, 2016, Twitter presented a "poor acquisition target" due to problems including dismal user growth and poor product implementation, among other things:

> Google and Apple will reportedly not make a bid on Twitter.

- 23 -

Google was seen as one of the most likely the buyers of the social media site, but sources close to the deal said the Mountain View-based company is no longer interested, according to Recode. Twitter stock was down more than 9 percent on the news in after-hours trading.

Several other sources told Recode that Apple was also unlikely to make a bid. One source noted that Twitter should maintain "low expectations" of an offer from a major tech company. Disney also will not make a bid on Twitter after consideration, according to a separate Recode report.

\*       \*       \*

Twitter recently told potential buyers it plans to conclude negotiations on selling the company by its third-quarter earnings report on Oct. 27, people familiar with the matter told Reuters. Twitter has more than 313 million monthly active users, but investors and analysts are skeptical the platform could bring much value to a bidder. Oppenheimer Holdings Inc., analyst Jason Helfstein wrote in a note to investors last week that Twitter would make a poor acquisition target "based on slowing user growth, poor product implementation/execution, decreasing user engagement, inferior advertising technology, platform safety issues, and strong competition."

69.     Due to the reports of Twitter's ongoing failure to increase user growth and poor product execution, the Company's stock price continued to decline, closing at $19.87 per share on October 6, 2016.

**D.     The Insider Selling**

70.     During the Relevant Period, and while in possession of material, adverse, non-public information, the Insider Selling Defendants sold their personally held or controlled shares of Twitter stock, reaping proceeds of over $281 million.

71.     As set forth herein, defendant Dorsey is Twitter's CEO and a current member of the Company's Board, and also served as Chairman of the Board during the Relevant Period.  Defendant Dorsey was in possession of material, adverse, non-public information regarding the inaccuracy of the Company's statements in press releases and public filings, as well as those made by other senior executives at Twitter.  While in possession of this information, on February 6, 2015 defendant Dorsey sold at least 75,090 personally held shares of Twitter stock at artificially inflated prices ($46.52-$48.17 per share) for proceeds of approximately $3,604,651.67.  Dorsey's sales were timed to maximize profits from the Company's then artificially inflated stock price.

72.     As set forth herein, defendant Costolo was a member of the Company's Board, as well as CEO, during the Relevant Period.  During the Relevant Period, Costolo was in possession of

material, adverse, nonpublic information regarding the inaccuracy of his own statements, the statements made by other senior executives, and the Company's statements in press releases and public filings.  While in possession of this information, defendant Costolo sold at least 77,009 personally held shares of Twitter stock at artificially inflated prices for proceeds of approximately $3 million. Costolo's sales were timed to maximize profits from the Company's then artificially inflated stock price, including the following sales:

(a) On April 1, 2015, Costolo sold 18,845 shares at $50.92 per share, generating proceeds of approximately $959,499.

(b) On July 1, 2015, Costolo sold 58,164 shares at $35.56 per share, generating proceeds of approximately $2,068,155.

73.     As set forth herein, defendant Williams is a co-founder of the Company and currently a member of the Board.  During the Relevant Period, defendant Williams was in possession of material, non-public information regarding the inaccuracy of the statements made by senior executives at Twitter and the Company's statements in its press releases and public filings.  While in possession of this information, defendant Williams sold more than 6 million personally held shares of Twitter stock at artificially inflated prices for proceeds of more than $274 million.  Williams' sales were timed to maximize profits from the Company's then artificially inflated stock price, including the following sales:

(a) On February 18, 2015, Williams sold 618,000 shares at approximately $48.00 per share, generating proceeds of approximately $29,669,632.

(b) On February 19, 2015, Williams sold 234,000 shares at approximately $48.00 per share, generating proceeds of approximately $11,244,598.

(c) On February 25, 2015, Williams sold 234,000 shares at approximately $48.60 per share, generating proceeds of approximately $11,380,256.50.

(d) On May 29, 2015, Williams sold 359,128 shares at $36.72 per share, generating proceeds of approximately $13,187,862.50.

(e) On November 30, 2015, Williams sold 1,848,342 shares at $25.25 per share, generating

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

1   proceeds of approximately $46,675,626.

2   74.    Thus, as a result of Defendants' actions, the Company has suffered damages. These

3   damages include (but are not limited to) severe loss of reputation and standing, and decimation of the

4   Company's stock price, costs incurred as a result of the SEC investigation, and the harm suffered as

5   a result of the Insider Selling Defendants' illicit sales of the Company's shares.

6                          **DERIVATIVE AND DEMAND ALLEGATIONS**

7   75.    Plaintiff brings this action derivatively in the right and for the benefit Twitter to redress

8   the breaches of fiduciary duty and other violations of law by Defendants.

9   76.    Plaintiff will adequately and fairly represent the interests of Twitter and its

10  shareholders in enforcing and prosecuting its rights.

11  77.    The Board currently consists of the following ten (10) directors: defendants Dorsey,

12  Fenton, Rosenblatt, Scardino and Williams, and non-defendants Omid Kordestani ("Kordestani"),

13  Martha Lane Fox ("Fox"), Hugh F. Johnston ("Johnston"), Debra L. Lee ("Lee"), and Bret Taylor

14  ("Taylor"). Plaintiff has not made any demand on the present Board to institute this action because

15  such a demand would be a futile, wasteful and useless act, for the reasons that follow.

16  78.    During the Relevant Period, defendant Dorsey illicitly sold shares of Twitter stock for

17  proceeds of approximately $3.6 million while in possession of material, adverse, non-public

18  information, during a time in which Twitter stock was artificially inflated due to Defendants' false

19  and misleading statements. As a result of these illicit sales, defendant Dorsey received direct financial

20  benefits not shared with Twitter shareholders, and is, therefore, directly interested in a demand.

21  Additionally, as a result of these illicit sales, defendant Dorsey violated the Company's Code of

22  Ethics. Further, defendant Dorsey is interested in a demand because he faces a substantial likelihood

23  of liability for his breaches of fiduciary duties of loyalty and good faith arising from his illicit insider

24  sales.

25  79.    During the Relevant Period, defendant Williams illicitly sold shares of Twitter stock

26  for proceeds of approximately $274.5 million while in possession of material, adverse, non-public

27  information, during a time in which Twitter stock was artificially inflated due to Defendants' false

28

and misleading statements.  As a result of these illicit sales, defendant Williams received direct financial benefits not shared with Twitter shareholders, and is, therefore, directly interested in a demand.  Additionally, as a result of these illicit sales, defendant Williams violated the Company's Code of Ethics.  Further, defendant Williams is interested in a demand because he faces a substantial likelihood of liability for his breaches of fiduciary duties of loyalty and good faith arising from his illicit insider sales.

80.    The principal professional occupation of defendant Dorsey is his employment with Twitter as its CEO, pursuant to which he receives substantial monetary compensation and other benefits.  In addition, according to the Company's Proxy Statement filed with the SEC on Form DEF 14A on April 15, 2016 (the "2016 Proxy"), Defendants have admitted that defendant Dorsey is not independent.  Thus, defendant Dorsey lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.  In addition, defendant Dorsey faces a substantial likelihood of liability for his illicit insider sales, as set forth herein.

81.    The principal professional occupation of non-defendant Kordestani is his employment with Twitter as its executive Chairman, pursuant to which he receives substantial monetary compensation and other benefits.   For example, Kordestani received $12,361,615 in total compensation from Twitter in 2015, despite working there for less than three months.  In addition, according to the 2016 Proxy, Defendants have admitted that Kordestani is not independent.  Thus, defendant Kordestani lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

82.    Defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams (a majority of the Board) served as directors of the Company during some or all of the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illicit acts alleged herein. The statements and actions regarding the Company's operations, such as the failure to disclose that that DAUs had become the primary user engagement metric tracked internally by Twitter management, and the trend in user engagement growth (*i.e.*, DAU growth) was flat or declining, that

- 27 -

1   defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams caused or allowed to be made

2   repeatedly during the Relevant Period were an integral aspect of the Company's core operations.  It

3   was these very actions and statements made and/or caused or allowed to be made by defendants

4   Dorsey, Fenton, Rosenblatt, Scardino, and Williams that caused the Company to suffer severe

5   reputational harm and decimation in stock price, as set forth herein.  This was in violation of (among

6   other things) these Defendants' fiduciary duties of good faith and loyalty, as well as the Code of

7   Ethics.  Thus, defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams (a majority of the

8   Board) each faces a substantial likelihood of liability for their acts in connection with these actions

9   and statements, rendering a demand upon them futile.

10         83.    During the Relevant Period, defendants Fenton and Scardino served as members of

11   the Audit Committee.  Pursuant to the Audit Committee Charter, the members of the Audit Committee

12   were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial

13   reports, reviewing the integrity of the Company's internal controls, ensuring the integrity of the

14   Company's financial statements filed with the SEC, and ensuring that the Company was in

15   compliance with legal and regulatory requirements.  Defendants Fenton and Scardino breached their

16   fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed

17   or permitted the Company to disseminate false and misleading statements in the Company's SEC

18   filings and other disclosures, caused the above-discussed internal control failures, and caused or

19   allowed the illicit activity described herein.  Therefore, defendants Fenton and Scardino face a

20   substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is

21   futile.

22         84.    Defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams (a majority of the

23   Board) each signed (or authorized the signing of) the false and misleading 2014 10-K.  The 2014 10-

24   K, signed and authorized by defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams, was

25   false and misleading because it failed to disclose (among other things):

26         (a) that under Defendants' direction and on their watch, DAUs had become the primary user

27         engagement metric tracked internally by Twitter management. The trend in user engagement

28

growth (i.e., DAU growth) was flat or declining.  As noted by the SEC, MD&A disclosure rules required the disclosure of key internal metrics used by management.

(b) The ad engagement metric, which Defendants intended to be "helpful to investors to understand" and "monitor trends in user engagement," was a monetization metric rather than a user engagement metric. The trend in "ad engagements" was not indicative of trends in user engagement. In fact, the trend in "ad engagements" was moving in the opposite direction (i.e., increasing) from the trend in user engagement.

As a result, defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams (a majority of the Board) each face a substantial likelihood of liability for their actions described herein, rendering any demand upon them futile.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

85.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

86.     As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Twitter disseminated accurate, truthful and complete information to its shareholders.

87.     Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Twitter shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

88.     As alleged herein, each of the Defendants had a fiduciary duty to, among other things, ensure that the Company was operated in a lawful manner and to exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

89.     Defendants willfully ignored the obvious and pervasive problems with Twitter's

internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

90.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Twitter, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing Twitter to misrepresent material facts regarding its business practices, financial position and business prospects.

91.    Defendants had a duty to Twitter and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Twitter.

92.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Twitter in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Twitter's affairs and in the use and preservation of Twitter's assets.

93.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Twitter to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Twitter, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Twitter.

94.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

95.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

96.    Plaintiff, on behalf of Twitter, has no adequate remedy at law.

## COUNT II
## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

97.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

98.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Twitter in the form of salaries, bonuses, and other forms of compensation.

99.    Plaintiff, as a shareholder and representative of Twitter, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**COUNT III**
**AGAINST DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934**

100.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

101.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the 2015 Proxy violated §14(a) and Rule 14a-9 because it omitted material facts regarding the Company's operations and future prospects.

102.    The 2015 Proxy was false and misleading because among other things, Defendants failed to disclose that: (i) under Defendants' direction and on their watch, new product initiatives were not creating meaningful growth in MAUs or user engagement; (ii) the reported growth in MAUs was the result of increased numbers of low-quality MAUs who were less engaged than existing Twitter users; (iii) by early 2015, Defendants were causing the Company to track DAUs rather than timeline views as the primary user engagement metric; (iv) by early 2015, the Company's metrics showed that user engagement growth was flat or declining; and (v) as a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

103.    Additionally, even though the 2015 Proxy sought shareholder votes for, *inter alia*,

1   director nominations and a long-term executive compensation program, it failed to disclose that the

2   Company's internal controls were not sufficient.

3       104.    In the exercise of reasonable care, Defendants should have known that the statements

4   contained in the 2015 Proxy were materially false and misleading, and/or that the 2015 Proxy omitted

5   material information.   The Company was damaged as a result of the Defendants' material

6   misrepresentations and omissions in the 2015 Proxy.

7                                  **COUNT IV**
8   **AGAINST THE INSIDER SELLING DEFENDANTS FOR BREACH OF FIDUCIARY**
    **DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION**

9       105.    Plaintiff incorporates by reference and realleges each and every allegation set forth

10  above, as though fully set forth herein.

11      106.    At the time of the stock sales set forth herein, the Insider Selling Defendants were in

12  possession of the material, adverse, non-public information described above, and sold Twitter

13  common stock on the basis of such information.

14      107.    The information described above was proprietary non-public information concerning

15  the Company's financial condition and future business prospects.  It was a proprietary asset belonging

16  to the Company, which the Insider Selling Defendants used for their own benefit when they sold

17  Twitter common stock.

18      108.    At the time of their stock sales, the Insider Selling Defendants knew about the direction

19  the Company was heading and the negative financial impact that would ultimately have on the

20  Company (and its stock price).  The Insider Selling Defendants' sales of Twitter common stock while

21  in possession and control of this material adverse, non-public information was a breach of their

22  fiduciary duties of loyalty and good faith.

23      109.    Since the use of the Company's proprietary information for their own gain constitutes

24  a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition

25  of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

26                                  **PRAYER FOR RELIEF**

27      WHEREFORE, Plaintiff demands judgment as follows:

28
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST
ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing Twitter to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to Twitter restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


Dated: November 8, 2016                    **BRODSKY & SMITH, LLC**


EVAN J. SMITH

9595 Wilshire Blvd.
Beverly Hills, CA 90212
Telephone: (310) 300-8425
Facsimile: (310) 247-0160

**PROFY  PROMISLOFF  &  CIARLANTO, P.C.**
JEFFREY. J. CIARLANTO
JOSEPH M. PROFY
DAVID M. PROMISLOFF
100 N. 22nd Street, Unit 105

- 33 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST
ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Philadelphia, PA 19103
Telephone: (215) 259-5156
Facsimile: (215) 600-2642

**LAW OFFICE OF ALFRED G. YATES, JR., P.C.**
ALFRED G. YATES, JR.
GERALD L. RUTLEDGE
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033

Attorneys for Plaintiff

- 34 -